This is 4-14-0557, Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board. Let's see, for the appellants, we have James Powers. Yes. And for the appellee, we have John Schmidt for the IELRB. Yes, sir. And we have Ronald Stratt for the University of Illinois. Excuse me, the UNI. Yes. The UNI. All right. 5-4-2-5-2. You might notice that we only have two members sitting here today. Our colleague, Thomas Hamilton, is ill. He'll be listening to the oral arguments on audio following the completion of the day. So, let's see, Attorney Powers, are you ready to proceed? Yes, I am. All right, you may do so. May it please the Court, my name is Jim Powers and I am an attorney for the Board of Trustees of the University of Illinois. This appeal concerns the Illinois Educational Labor Relations Board's erroneous certification of a bargaining unit limited to approximately 30 non-tenured teaching associates at the University's Urbana campus out of a larger group of approximately 500 full-time, non-tenured track faculty. In analyzing the Board's error, the University wishes to stress that this case is not about preventing the teaching associates at the University's laboratory high school from joining a bargaining unit or exercising their collective bargaining rights. Rather, this case is simply about the IELRB honoring the original intent and the original application of its presumptively appropriate bargaining unit rules for the Urbana campus, as reflected in the Board's case law. By doing so, the IELRB would not in any way be depriving the teaching associates of the right to exercise their collective bargaining rights. Indeed, a proper application of the Board's rules to this fact pattern would simply mean that the teaching associates would likely become members of the larger, non-tenured track bargaining unit that is currently represented by the Illinois Federation of Teachers. By extension, the Board could avoid the needless multiplication of bargaining units at the Urbana campus, which the Board's presumptively appropriate unit rules were originally designed to address. Why would I want to be represented by people who did not have to deal with pre-teens, who had the office hours of professors, who had different educational concerns and protocols in the classroom? How do they represent my interests? I think the answer lies in the original intent and purpose behind the presumptively appropriate rules. When you look at Section 7 of the Ed Act, it doesn't guarantee unlimited choice in being in a bargaining unit of your choice. It requires a bargaining unit that is appropriate for purposes of collective bargaining. But it also doesn't constrain one that would be appropriate. It requires an appropriate unit. The Board, in its discretion, has designed a system of rules to apply to the University of Illinois to avoid undue fragmentation. Taking into account those factors... But why is this undue fragmentation? That isn't the evidence presented regarding the differentiation. At the third prong of the test, consistent with how the Ed Board has designed and applied the third prong of the test in prior case law, the Board doesn't look at the actual possibility of fragmentation. It looks at the possibility of fragmentation. And in this case, with approximately 114 academic units spread throughout the Urbana campus, if the Ed Board's decision is allowed to stand finding unique and special circumstances based on nothing more than special skills and abilities, what would stop units such as the English department, the astronomy, the physics, go on down the list to similarly say, we also are special. We have special certifications and special skill sets that set us apart from the rest. But they're all doing this with college students. That is correct. And I'm not saying that those petitions would ultimately be successful at the end of the day. But to require or to allow for a certain amount of consistency at the Urbana campus, as well as the UIC campus, if you allow a deviation from the Board's case law in this respect, where the Board's case law very clearly states, in light of the McKinley Health Center case, that simple differences in job duties, certifications, education, working hours does not qualify as special circumstances and compelling justifications. If you allow this decision to stand, it will only encourage other academic units throughout the campus to say, I'd like to try that. I would like to also follow that line of reasoning by the Ed Board and see if I can actually form my own unit as well. We would argue that that would ultimately be unsuccessful. But that is one of the dangers of deviating from your past practice in a case like this, is it will just encourage and engender more litigation. How many Barclay units are there? This would probably a matter of public record. I think throughout the entire system, there's upwards of 50. I think it's probably 50-plus at this point. As you've probably heard me reference, the University believes that the key error in the application of the Board's presumptively appropriate rules really falls at the second prong of the test, the special circumstances and compelling justifications prong of the test. As the Labor Board has indicated in its brief, the Board has never really provided a strict definition of that phrase. Instead, the Board has opted to take that phrase and apply it to a variety of fact patterns as they come up from time to time in the form of representation petitions. In light of that, it becomes rather important for the Board as an administrative agency to follow its precedent. Significantly, neither the Board nor the two unions in this matter have challenged that administrative law principle. An administrative agency is expected to either, one, follow its precedent, or two, if you're not going to follow that precedent, at the very least explain, provide a rational explanation for why the facts of the one case depart or deviate from the facts of the current fact pattern. Here, neither Board nor the unions have cited a single Educational Labor Relations Board decision in the University's appropriate unit context that supports the creation of a fragmented, stand-alone, free-standing unit such as we have here at the Uni High. Rather, as we've mentioned in our brief, historically the Board seems to have approved these types of units in only three categories up to this point in time. One category being where the University actually agrees to the non-conforming unit. A second category, when the union is looking to expand a historical unit that predates the rules, the Board in those cases have said, yes, those are special circumstances and compelling justifications. And the third category is where the union is seeking to organize a group that doesn't even fall within the contours of one of the presumptively appropriate units. So while the Ed Board and the unions have not cited a single case that supports a fact pattern like this, as you've read from our briefs, the University has cited at least two decisions, the McKinley Health Center decision being the most prominent of the two, that we believe justifies the rejection of this bargaining unit in question. The Board primarily has contested the significance of the McKinley Health Center case. The unions didn't address the case in their briefs. The Board, in its brief, takes issue with relying on the McKinley Health Center case really for two reasons. Number one, it was a short decision, short on legal analysis. And number two, it was subject to an order to show cause. The University would respectfully submit that those are distinctions without significance. It appears what the Board is really attempting to say here is that you, the Court, and the Board should disregard the McKinley Health Center case because it's tantamount to a default judgment. That's the implicit message that you get from the Board's decision and the Board's brief. A default judgment typically is little more than a ruling in favor of one party when the other party fails to participate or fails to actually file an answer. By default, the one party wins. In this case, McKinley Health Center, it is worthy of significance and worthy of persuasive effect because of the fact it was a fully litigated case. Four-day fact-finding hearing, post-hearing briefs, appeals to the full Educational Labor Relations Board in the late 1980s. A full evidentiary record was compiled in that case. The Board reviewed that evidentiary record. And in its decision, indicated that it had reviewed that evidentiary record and based its rulings on that record. I will quote on page two of the decision. Because the unit requested in the instant petition is not in conformity with the presumptively appropriate bargaining units, and because there is no evidence to justify our deviation from those presumptively appropriate bargaining units, we hereby dismiss the petition. In addition, the Board in that case actually cited the second prong of the test, indicating that the union had failed its burden. The point being, McKinley Health Center is worthy of persuasive effect. It's worthy of being taken notice of, if you will. In light of that, the applicability of McKinley Health Center, it was incumbent on the Board to do one of two things. Either follow it and follow the approach that they took in that case, where they discounted the significance of different job duties, the significance of different work locations, the significance of different working hours, and still dismissing that petition that involved the 18 MDs at the McKinley Health Center. Or, if the Board was going to disregard that or ignore that decision, to at least give a coherent, rational reason for why the facts of the one case depart from the facts of the present case. The Board did neither. Instead, it left a series of troubling questions for the court and for the parties to grapple with in the wake of that decision. For example, why was it that the provision of medical services to the university community, when no other group of employees provided medical services on the campus, was not enough to justify a separate unit? Whereas, simply teaching a group of students, albeit of a slightly different demographic than the students that attend the rest of the college, is enough for a separate unit? The Board didn't answer that question. Why was a special student fee funding mechanism at the McKinley Health Center, that's described in that decision, why was that not enough to justify a separate, stand-alone unit of 18 MDs? Whereas, the partial funding of Uni High through the State Board of Education funds is enough? The Board didn't answer that question. Why was the separate, special 24-hour, around-the-clock shifts and special working hours of the physicians at McKinley Health Center not enough to warrant a separate, stand-alone unit? Whereas, the different academic work schedule at Uni High and the different working hours was enough to justify a separate unit in this case? Again, the Board did not answer those questions. These and other unanswered questions simply reinforce the view that the Board clearly erred by failing to either follow its precedent or, at the very least, provide a rational explanation to the participants in the case and to future litigators or future participants who rely on Board precedent to guide their decisions as to whether or not to file petitions in the future. Again, the University is very concerned that when you don't provide a strict definition of what special circumstances and compelling justifications are, all parties have to go by is what your prior case law says. And if you're going to deviate and be inconsistent with prior case law, it upsets the apple cart. It really makes it hard and difficult to predict with any degree of certainty what the results of future cases are going to be like. I would just like to briefly mention on a related topic the issue of the pending petition by the Illinois Federation of Teachers. The parties devoted several pages in their briefs to that issue. Under normal circumstances, just to make it clear for the Court, the Board finds the existence of a pending competing petition significant for the special circumstances and compelling justifications analysis. It makes logical sense in that context to consider the existence of a competing petition, especially if the competing petition seeks a perfectly conforming unit. All things being equal, it's logical to assume that if the Board is faced with two competing units for the same subset of employees, one conforms, one doesn't. All things being equal, it would seem logical to say that the Board should opt for the conforming unit. That is why the existence of the competing IFT petition for the larger rump group is significant. That was filed before the Ed Board had finished its decision in this case, before it had finished actually issuing its written decision. Possibly, logistically, they slipped through the cracks so it didn't reflect and find its way into their analysis in their decision, because they actually say there was no other pending petition. We now know that that is clearly erroneous. That, to us, is significant and only, again, detracts from the finding of special circumstances and compelling justifications. Just as the special job duties, the special funding mechanisms, the special work schedules weren't enough to justify a separate unit in this case, just as it wasn't enough to justify a separate unit in McKinley Health Center, on top of that, there was a pending petition that, at least on the face of it, we've heard statements that suggest that maybe that wasn't the union's intent and it certainly wasn't the union's intent at a later point in the proceeding, but on the face of that petition and on the face of the certification as it's now drafted, it includes all full-time, non-tenure-track faculty. The board has found that that also includes uni-high teaching associates. That, in conjunction with the board's prior precedent, seems to suggest that the union should not have been able to carry its burden by clear and convincing evidence at the second prong of the test. I would like to briefly end my comments today by just touching upon the constitutional issue that the union, the IEA raised in its brief, we believe belatedly. It's undisputed that that argument was never raised before the Educational Labor Relations Board or its ALJ. We would submit that the union has waived that challenge. Even if you reach the merits of that, the union is arguing that the rules of the Educational Labor Relations Board violates the rational basis test. As we have cited in our brief, it's a very low threshold. As long as there is some rational basis, some rational justification for the rule to begin with, as well as the distinction between the university and other universities, it survives. It passes the rational basis test. As we explained in our brief, there are clear distinctions between the university and the rest of the public universities in Illinois. The university is the largest public system in terms of faculty and students. And not only that, but we have two of the most highly rated research campuses among public universities in the state, as rated by the Carnegie Institution. Those, even if they weren't the Ed. Board's original intent and purpose when they crafted the rules, certainly is a rational basis for the rules. And for that reason, we would suggest, especially in light of the Attorney General's lack of an ability to defend the rules because of how it was raised in the briefing process, we would request the court to reject that constitutional challenge. In conclusion, the Board has failed to consistently follow its precedent when interpreting and applying its presumptively appropriate bargaining rules to the current fact pattern. As a result, for these and other reasons, as set forth in the university's brief, the university respectfully requests that the court avoid the needless fragmentation of the university's workforce and reverse the Board's certification of the IEA as the exclusive bargaining rep of the Uni High Teaching Associates. Mr. Schmidt, are you going first? Yes, Your Honor, I am. Thank you. And may it please the court and counsel, John Schmidt, Assistant Attorney General John Schmidt, on behalf of the Illinois Educational Labor Relations Board, which asks that its two certification decisions be confirmed in this case. I'll start very briefly with the area in which we agree with the university. We do agree that the Board's rules are constitutional and feel that the university ably said why in its reply brief. And if there are no questions on that, I'll proceed to where we respectfully disagree, which is on the issue of how the rules were applied in this case. Essentially, the main issue here is, of course, relates to the recognition of the Uni High unit and whether there were special circumstances and compelling justifications. And the Board concluded that there were and did so primarily because of the great differences that exist between what Uni High teachers do and what the university's non-tenured track faculty do. And also because of significant differences and the uniqueness, really because of the uniqueness of Uni High itself, which is unlike the university, it's a public high school. The teachers are serving a totally different group of students, younger, far less mature than other students. They're working on a different academic calendar. They have to supervise the students outside the classrooms, whereas university students are presumed to be adults. They have to do tasks such as supervise the uni period study hall, perform lunch duty. They're expected to have a great degree of availability to the students and also to the parents, too. So there are significant differences in working conditions, and those also include different evaluation schemes. Their pay is determined by a special grid that applies to them, but not to the university faculty. And Uni High itself, while it is a part of the university, in a way does have a separate identity and to a great extent does function differently. It is also funded separately. It does receive a portion of its funding from the university itself, but the principal funding source would be the principal source for most public high schools, which is the State Board of Education per pupil allocation formula. And that's significant in terms of collective bargaining, because if there are different funding sources, it could be that the university's funding is significantly lower, but that might not affect Uni High's ability to pay its teachers and so forth. So that's another very significant difference. And in the McKinley Health case, which Council relies upon principally, I think, the funding source was student fees, which is a traditional university funding source, whereas here, again, it's the same funding source that most public high schools have. So we believe that these differences are very, very, very significant. With regard to, we think that the Ed. Board, too, did explain on page 13 of its decision the differences between this case and McKinley High. In the first full paragraph, where it explained that McKinley High did not involve a public high school, which was separate from the university's other functions, and funded in a different manner. It was a short explanation, but there was some explanation there. So we think in this situation, there is far less of a danger of fragmentation than there might be in a case where a group like the McKinley Health doctors perform services, but performs those services for the university students themselves, as opposed to performing them for high school students. And for a high school that, at least in some ways, yes, it's affiliated with the universities, but in many respects, as I've indicated, it does have a separate identity. And Mr. Powers also raised the issue of the pendency of the second petition, the Campus Faculty Association petition. That petition was filed, it was pending at the time the Board issued its decision. However, it had been filed the day before. I think the most likely explanation is that the Board simply may not have been aware of it because of that situation. And the language of the Board's decision would indicate that the result would have been the same. And I'll draw the Court's attention to page 12 of the Board's decision, which is in the university's appendix at page 8-12. In the last sentence of the carryover paragraph at the top of page 12, it refers to the function of uni high teaching associates as high school teachers. And it says, this difference in function as well as the distinctive nature of uni high school is a special circumstance and compelling justification that would warrant the separate bargaining unit for the uni high teachers. And I think that means by itself it would warrant it. The next paragraph goes on to talk about the fact, to talk about there being no pending petition. So I believe the result here would have been the same regardless of that. And Mr. Powers is right. Technically, that statement that there was no pending petition was an error. But I believe I explained why it was an error, why it appears to be an error. For these reasons, I'll also emphasize that there is a clearly erroneous standard of review here. And we do not believe that the university has met its burden of showing clear error under these circumstances. Again, uni high is a very, very distinctive situation within the University of Illinois. And we believe that the distinctions that I've discussed, the board believes they did warrant a separate unit. And again, this is not likely to result in a proliferation of bargaining units for the reasons I've stated. And another fact is, if there is and hopefully there would not be a labor dispute, it would be limited to uni high. If there are no questions, I'd ask that the board's decision, or the board's two decisions in this case, be confirmed by the court. Thank you, your honors. Thank you, Mr. Stratt. Good afternoon, counsel. May it please the court, my name is Ron Stratt, and I'm here today on behalf of the uni high teachers at the University of Illinois that were certified as the uni faculty organization. The test that Mr. Power speaks of in the two prongs are actually, it's not a test, and these aren't two prongs. These are constitutional impediments to university employees' rights to exercise their rights under the act. What Mr. Powers talks about with the prongs of special circumstances and compelling justification and fragmentation actually are unconstitutional impediments to these employees to exercise their rights under the act. No other university employee is required to show special circumstances and compelling justification. Any other university employee at northern, southern, eastern, western, or any other university under the state of Illinois is required to show these two additional requirements. And not only that, they have to show them by clear and convincing evidence, which no other university employee must do. Did you make this argument to the labor board? Yes, this was raised below. I actually said to the labor board in my post-hearing brief this exact argument, that the labor board had exceeded their authority under section 9 of the labor act, which allows them to write rules. And I specifically stated in the post-hearing brief that what the university has done exceeds their authority because they're actually treating similarly situated employees differently. Like I said, no other university employee must show these additional requirements. And what is the board's rationale for promulgating these rules? First, they say, to streamline the administrative process. Quite frankly, any educational employee who wants to exercise their rights under the act files a simple one-page form that's distributed by the labor board. How is it that these presumptively appropriate bargaining unit rules streamlines the administrative process that everybody follows? Secondly, they rationalize the rules by saying it brings a degree of predictability. What predictability? There's no more predictability with the presumptive bargaining units than there is with any other bargaining unit. And by the way, these are presumptively appropriate, which means they can be rebutted at hearing, just like any other group that's petitioned for recognition under the labor act. I would submit to the court that the real reason for the rules can be found on page 22 of the university's post-hearing brief, which provides the board's rules clearly reflect the board's intent to make it fairly difficult for a union to circumvent the labor board's presumptively appropriate units. Also cited in the university's post-hearing brief is a comment from a general assembly member at a hearing on the rules. If your petition does not conform to the units on here, it would be dismissed unless you can show extraordinary circumstances. No other university employee has to show extraordinary circumstances. All the other university employees only need to show the unit appropriateness under section 7 of the act. And for those reasons, I would argue that the board's rules, particularly those two extra requirements, are unconstitutional and may violate the Constitutional Constitution Equal Protection Clause. Now, with respect to waiver, I would submit that the waiver is not a limitation on this court's jurisdiction. The court is free to consider the constitutional arguments that we've raised in the briefs. It was raised below. This is not a case where it was completely silent. As I stated before, it was raised and it was raised sufficiently for the university to raise the argument in their first brief to this court. No. No. No. And so for those reasons, I would ask that this court consider that those two prongs that Mr. Powers is talking about is unconstitutional as it violates the rights of the employees of the University of Illinois to exercise their rights under the act. Thank you. Mr. Powers, do you have a follow-up? Yes, just very brief. Just to clarify, the references I believe counsel is making about the union's argument about the challenge to the regulations, I believe they appeared in footnotes in two of his briefs before the board. And the footnotes, I believe, reference how the rules violated or were inconsistent with the Educational Labor Relations Act. I don't recall ever seeing any reference to the Constitution or the Equal Protection Clause or the rational basis test. So it was an argument that the rules were inconsistent with the statute. I don't believe that there was any argument that the rules were unconstitutional. So I just wanted to clear that up. And then very briefly, regarding the board's argument that the differences for uni high between the teaching associates and the rest of the non-tenure track faculty are significant enough to justify a separate unit under the special circumstances test. We would submit that the differences between those two groups are much less significant than the differences you can get between trained MDs who go to medical school, who are responsible for prescribing medication, doing medical examinations, doing medical procedures to the university community. When in that case, the fact pattern showed not a single other academic professional, not a single one of the other 1,000 academic professionals, did those types of things. We would submit that, logically speaking, how much more different can you get than a group of 18 MDs versus the rump group of academic professionals that work in a variety of occupations ranging from the theater to human resources to engineering labs? When you're comparing the differences between the two cases, we don't think there was any comparison. The differences in the McKinley Health Center case between the two groups was much more significant than any minimal differences that we might see in work schedules and the identity of who the teachers actually teach. At the end of the day, as the ed board had actually made a factual finding in its decision, uni high teachers teach. In essence, the college faculty teach, albeit to a different demographic, but they teach. For those reasons, we would again request respectfully that the court reverse the certifications in the two underlying cases because the board has inconsistently applied its rules and has inconsistently applied its past precedent. I think I may have asked my question previously in a way that you didn't understand. That's the question about how we bargain units. What I meant to ask, and I didn't ask it correctly, is we have a unit for the tenured faculty. There's a unit for non-tenured faculty. Among faculty, are there any other units that have ever been approved as appropriate? No. As a matter of fact, at the UIC campus, the union in that case, we were actually before this court three years ago on that issue, but ultimately what happened at the UIC is there are two faculty units. There's the non-tenured track and there's the tenured track. There are no other faculty units at UIC. At UIUC, the Urbana campus, right now the only unit that's organized is the non-tenured track faculty that is represented by the IFT and the little sliver group of the 30 uni high teaching associates, which are considered non-tenured track faculty. Just to be fair, a petition was recently filed at the Springfield campus seeking to organize the tenured track faculty, but that has not been finished being processed yet. So when you were saying there were 50 different bargaining units, you're talking about janitors or maintenance people? Yes. But among faculty, there's just the two? There's the two at UIC and then there's just the one, the non-tenured track faculty in this case at Urbana. The UIC doesn't have a high school associate? No, it doesn't. Thank you very much. We'll take this matter under advisement and leave recess.